The Honorable, the judges of the United States Court of Appeals for the Fourth Circuit. All right, good morning, counsel. We are prepared to hear argument in our final case this morning, Barrett v. PAE Government Services, Inc. And we'll begin with Mr. Cohen. Good morning, and may it please the court. My name is Peter Cohen, and I'm counsel for the appellant, Dr. Karen Barrett. This case is another in a series of cases this court has been addressing in recent years regarding the involuntary civil commitment of citizens for mental health evaluations and treatment. The process is typically initiated by the police who are called to the scene, and the court's cases on this subject tend to divide into two broad categories. Cases where the police are called to emergency situations and have to make snap judgments in the moment. And those cases where the police are called to a scene where there is no emergency or exigent circumstances. And this court, in its decisions, has been more willing to provide state actors with more constitutional slack in cases involving emergency situations and extend qualified immunity to the state actors involved. Whereas in the non-emergency cases, the court has been more scrutinizing of the state actors. And this case before the court is emphatically falls in the non-emergency line of cases. And we asked the court to apply a greater scrutiny to the actors in this case than did the district court and reversed the district court's decision to grant qualified immunity to the actors in this case. Dr. Barrett is a 59-year-old highly educated researcher. She has extensive experience working overseas since the 70s and the 80s into the 90s. She's worked internationally on national security issues and law enforcement issues, helping other countries with law and order type issues, including civil justice reforms and the like. In 2012 to 13, she was a PAE contractor working on a State Department contract in Afghanistan where she was training local officials, again, including the police and the court systems and local law enforcement issues. In 2014 to 16, she was assigned to Dubai where, unfortunately, a Pakistani gang moved into her neighborhood, which happens in that part of the world. And the Pakistani gang began to stalk, terrorize the women in the neighborhood, including Dr. Barrett. I have a question. Going to the allegations in your complaint here, what support is there for the notion that these officers, number one, knew that she was not a danger to herself and others, coupled with, number two, that they went ahead and conspired against her anyway to get an emergency custody order? Well, the evidence in the case shows that the police officers first were called to the scene in a non-emergency situation. They talked to two PAE officials there, Mr. Horner, who's the security agent, and Ms. Wilborn, who's the HR person. Both of those individuals testified in their depositions that Dr. Barrett did not pose any type of threat, did not pose any type of danger to either herself or anyone else. Then when Dr. Barrett met with the police, she walked into the conference room voluntarily. She thought that the police were there actually to help her to investigate her claims of being stalked here in the United States, which is a phenomenon. She went earlier to the Fairfax police, who confirmed the existence of this phenomenon. They were versed in it. They provided her with advice on how to handle the situation. She was calm at all times with the police officers. She was not disheveled like in some of the other cases. She tried to educate the officers as to what she was going through, the parts of the world that she was at, including the fact that she went to the Fairfax police. She gave the Arlington officers copies of the Fairfax police's business cards and invited them to call the police officers she was dealing with Fairfax to confirm that this was a real thing and that she was concerned about it. She also provided Ms. Wilborn and Mr. Horner, the security agent and the HR person, with PAE witnesses who saw the stalking. The second amended complaint describes several instances where PAE employees were at a restaurant with Dr. Barrett or were in a parking garage downstairs from the PAE's offices where they saw Middle Eastern men approach Dr. Barrett. And act in menacing ways, including at the restaurant and also causing damage to her car. And there's a witness who saw a Middle Eastern man running away. So she described all of this to the police officers. She tried to make them understand as to what she was going through. She was asked specifically, do you plan on harming anyone? Do you plan on harming yourself? She emphatically answered no. This was a non-emergency situation. There was discussion about a gun during this conference room meeting. She confirmed that she was the owner of a gun, that she bought it 11 years ago in Albuquerque, New Mexico, that she never used the gun, that the gun was in its original box in her home, that it was not at the office and that she would never bring it to the office. And one of the police officers testified that they concluded that Dr. Barrett would not use the gun to defend herself. There was also other discussion. As far as we know, the police officers never contacted the Fairfax police to confirm what Dr. Barrett was talking about. Never talked to the PAE employees who were present at the PAE office where the police officers were to confirm that they saw the stalking along with Dr. Barrett. And again, Dr. Barrett at all times in this case presented herself in a calm, demeaning manner. This is in direct contrast. Mr. Cohen, I appreciate that recitation of the evidence with respect to what the officers may have seen and perhaps that may be enough to suggest that the officers may have violated your client's civil rights. But the second part of Judge Thacker's question was, what is the evidence that there was an agreement between these officers and Ms. Barrett's employers to violate their civil rights? I mean, they didn't know each other before this. It just seems kind of odd that a pair of officers would show up at someone's place of employment and say, well, today I'm going to conspire with the employers to violate this particular employee's rights. What's the evidence of that? The evidence is that the police officers spoke at length with the PAE managers about Dr. Barrett. We have asserted that in order to have a conspiracy or to have joint action here, that all that needs to be shown is that the police officers entered into a conspiracy with the PAE officials to seize Dr. Barrett, whether there was probable cause or not. And the evidence of that is that Wilborn and Horner both testified that they told the police officers that she was not a danger. She did not pose a threat to anyone. And also, the discussions that they were having between the July 12th... I can't hear you, Judge Thacker. Thank you. Speaking of Wilborn, I know there's an apparent dispute as to whether the officers saw Wilborn's report, which detailed all of the things that had been going on with your client. But Wilborn did testify that she told the officers the things that were in that report. And one of the things in that report is Ms. Barrett saying, quote, End quote. Isn't that some justification for the officers believing she may have been a danger to others? Our position is no, because of what she testified at her deposition. First off, on that report, your Honor is correct, the police officers never saw that. That was an after-the-fact report. But Wilborn did tell them what was in the report. Well, what she testified at her deposition is that she described a conversation she had with Dr. Barrett about the way that people in Afghanistan handle matters of stalking. Not her. And part of that was Dr. Barrett, because she's been in Afghanistan... Well, yes, I understand that's how people in Afghanistan, she says that's how they handle it. But she also said they just have to be killed. Like Trump said, we just have to turn the key, lock them out, and drop a bomb on Pakistan. So Trump, I assume, is President Trump, who is not in Pakistan. That was during, this occurred, there was an acknowledgement of a discussion about President Trump's statement about bombing Pakistan. Ms. Wilborn testified at her deposition that that came up in the context of simply discussing President Trump's remark, and that Ms. Wilborn did not conclude that, based upon their joint discussion of President Trump's comment, that Dr. Barrett was going to bomb Pakistan. Or that there was going to be any type of violence taken against anyone, including Pakistani men. There's a big divide here between what Mr. Horner and Ms. Wilborn testified at their deposition, and what some of the documents at the time show. Ms. Wilborn and Mr. Horner, who were the primarily sources of information to the two police officers, both confirmed during their deposition that they did not tell the two police officers that she was a threat. And did testify in her deposition about the President Trump remark, but that Ms. Wilborn did not conclude that she was going to bomb Pakistan, or that she was going to take any sort of violence against herself or anyone else. Mr. Horner also confirmed that in his deposition, that he never told the police that she posed a threat either to herself or anyone else. And we have documented all of that testimony in the brief. Mr. Cohen, isn't the question of what impact, if any, those statements would have had on the officers' actions, irrespective of what the employers might have said. I mean, taking that in the abstract, that is a concerning statement, don't you think? Again, what Ms. Wilborn testified to was not that Dr. Barrett was saying she was going to bomb Pakistan, but rather they were discussing the comment that President Trump had made. And that there was no conclusion that she was in the process of engaging in any type of violence. You know, the police officers, you know, unlike the other cases where the court was willing to extend qualified immunity to the police officers or to the mental health evaluators, this was not a situation where Dr. Barrett indicated she was going to do any harm to anyone. She was trying to bring, she was trying to educate the employer as to what her experience was, including with the Fairfax police, invited them to talk to the Fairfax police, who confirmed the phenomenon she was experiencing. She showed no indications of harming anyone. And she actually, when she walked into the conference room, she thought the police were there to help her. I think it's on this time. Is it, in response to Judge Diaz's question, you indicated that the managers told the officers she wasn't, they didn't feel like she was a threat. Is that right? That is correct. Okay. Then going back to Judge Diaz's earlier question, how could they have been conspiring with the officers to unlawfully get her committed if they told the officers that she wasn't a threat? The conspiracy was to seize her regardless of probable cause. And that is what happened. Then they wouldn't have told them she wasn't a threat. Well, I see that my time is out. May I answer? Oh, I'm sorry. Go ahead. The evidence shows that PAE individuals had a different motive for what happened here. There are allegations in the second amended complaint where she uncovered a large amount of fraud that was going on the PAE under the State Department contract. And that PAE orchestrated this with the police in order to remove her from the scene. No one is alleging that the police officers shared in that motive. But for joint action and or for conspiracy under 1983, they don't have to. The nature of the conspiracy between the police and the PAE individuals was to seize her without probable cause, which did occur. Judge Thacker, do you have any other questions? No, I don't. Thank you. All right. We'll hear from the appellees. Mr. Tremblay. Good morning. May it please the court. I'm R.A. Tremblay and I represent the two Arlington police officers and the Arlington mental health examiner. And I'm going to address the district court's grant of summary judgment to those appellees. Mr. Elmer is going to address the grants of the motion to dismiss and the conspiracy allegations. I think it's important to look at the progression of events and the timeline here to understand it wasn't a non-emergency, but the chronology events indicated an ever increasing urgency that I think plaintiff's counsel has understated. As I think you know from reading the briefs, plaintiff believes that there's a complex, sophisticated network of stalkers of the same ethnic origin who watch her at all times from every corner, never using the same car, due to an apparent dispute with a real estate agent in Dubai. Now, she went to the Fairfax police, but got no satisfaction from them. The stalking continued. She believed the stalking and stated to believe the stalking wasn't going to stop, it was going to continue. She stated that she believed the stalking had been escalating and becoming more aggressive. That she'd been followed to work, surrounded in the garage at work, and surveilled in the courtyard at work. She believed that the stalkers were getting bolder. She even believes that she had a face-to-face confrontation with a stalker who somehow evaded security at her work, walked up to her desk, and said hello. Now, Ms. Wilborn testified it was highly unlikely an outsider could gain access to the office and locate Ms. Barrett's cubicle. In all likelihood, if that occurred, it was a co-worker. But she believed the stalkers were getting bolder and confronting her at work. Then she claimed she had a breakthrough. This is where things started to go downhill. She claimed she had a breakthrough, a turning point that escalated the situation. She caught a man in the courtyard on a cell phone talking to the hub in Dubai, and she went after him. She didn't leave him alone. She went and followed him. And she followed him and found out that he works in the building next door in the Federal Deposit Insurance Company offices. She figured out that now she knows where the hide or nest of these stalkers can be found. She confirmed this by her view that those types of people, in quotes, are accountants, so it makes sense for the stalkers to be in the FDIC. Not only does Ms. Barrett believe the stalkers have become more aggressive, she's become more aggressive. She said she wants to confront the stalkers. She told Ms. Wilborn that she wanted to walk up to the stalker and forcibly take his cell phone away from him. Ms. Wilborn testified that Ms. Barrett was sending the stalkers a message about gun use, that she would go to the gun range to fire her gun, her Glock, and that she'd take her phone with her because she knew the stalkers were tracking her through her phone and would know that she's at a gun range and perhaps would be intimidated by the fact that she has a gun. As a result of all this, Mr. Horner wrote to the police and said he was concerned about an increasingly delusional and increasingly paranoid employee. Ms. Barrett wrote in an email, Nothing can be done legally. I'm aware of the complexity and severity of the war we are fighting because I live it every day. She believes she's in a war. She said they're an uncivilized society and they have to be killed, that she's been advised that stalkers never give up and the only way to deal with them is to kill them. With regard to the officers, where in the record is there any indication that they saw those sorts of allegations, or that they saw the Wilborn report? Page 430 of the appendix, I'm sorry, page 431 of the appendix, Mr. Horner describes his discussion with the police and he says, Did you say page 431 of the appendix? Yes, you are. I apologize. It's 431, where at line 6, Mr. Horner says when he talked to the police, he told them everything that was in his notes and everything that was in Ms. Wilborn's statement. He said he discussed with them all of those matters. It's curious to me why that's not in the police report. Those sorts of allegations, I mean, the words kill are not in the officer's report. I believe Officer Hall testified that there was a discussion about killing people. I understand that. But it's not in the contemporaneous report. I understand, Your Honor. The best I can say about that is the police write short reports to document their actions, not in the thoughts that in a few years they're going to be in a civil lawsuit where they have to have every word written down. That's been my experience. They don't write reports for civil litigation. So the fact that they don't include anything... But it seems like if you were getting an emergency custody order against someone that you believe to be a danger to themselves or others, the fact that they had threatened to kill people might be at the top of even the most brief report. Well, and I'm speaking for the officers. Perhaps at that point they had the written statement from Ms. Wilborn, which was part of the report, and that was documented there. Okay, thank you. Have I answered your question? Contrary to what Appellant's counsel said, both Mr. Horner and Ms. Wilborn were concerned that Ms. Barrett would harm others, and they reported this to the police. Ms. Wilborn in particular stated she believed that Ms. Barrett thought the stalkers were becoming more aggressive and would mistake a co-worker as a stalker and take action against them. Mr. Horner testified that based on the collective body of statements, the situation was escalating and Ms. Barrett wanted confrontation. Ms. Barrett herself said to the police she hoped she's able to defend herself when the moment comes. So even Ms. Barrett was anticipating a confrontation with these, I believe, imagined enemies. So it was against this backdrop that the police had to make, and the mental health examiner had to make decisions, but they still acted thoroughly and deliberately. In the Gooden case, for example, the police visited the apartment three times, even though it was an urgent situation. If the police had acted more quickly, I think counsel would be saying they rushed to judgment. But they did a thorough, deliberate investigation. Now, I don't think in reading this court's cases dealing with mental health detentions that there's any case quite like this. In the Safari v. Tingle case, this court stated, before concluding an officer has breached a clearly established right, a case must be identified where an officer acting under similar circumstances was held to have violated the Fourth Amendment. I don't believe any such case exists. Only two cases have been decided that address the threat to the other standard, the Goins case and the Robb case. In both Goins and Robb, this court decided that the mental health examiner did not violate the Fourth Amendment, and found he was entitled to qualified immunity. This court has not decided a case where they found a mental health examiner violated the Fourth Amendment. There's no such case. And as the court stated in Robb, no case clearly prescribes the conduct or even conduct similar to it. The same rule applies here. Now, in the Goins case, the court did reverse. Yes, Your Honor. Can I ask you about the, you mentioned the mental health examiner. So what are we to make, and the issue of whether or not he acted reasonably, what are we to make of his statement to Mr. Lietzow that he didn't, after I guess looking at the record and spending some time thinking it over, that he didn't really see much reason to keep her, and nonetheless she was in fact detained. Does that call into question the reasonableness of his decision? No, Your Honor. First of all, Mr. Lietzow testified he did not hear the troubling statements that were made to Mr. Horner and Ms. Wilburn. He could not comment on them. He didn't say, I can't believe she said that. I can't comment on what she said to those other people because I didn't hear them, and I can't testify as to whether or not they should be put in danger by, or put in fear by what she said. Second of all, Mr. Lietzow testified at his deposition, he didn't really know her very well. When I asked him if he was aware that she had hired a private investigator and said that she needed to get somebody to go over there and harm these people, he would say something like that. Well, I'm more focused on what Mr. Galway told Mr. Lietzow about whether or not he should, in fact, whether in fact he had any reason to keep Ms. Barrett even after receiving all this information. Well, he was still in the process of gathering information. He was talking to other people. He talked to the two doctors at the hospital who thought Ms. Barrett should be detained. He was very deliberate. He went back to his office, met with an entire team of mental health examiners and discussed the case about what to do. And after getting all of the information that he gathered, after talking to Mr. Lietzow, he reached the decision he needed to petition for a temporary detention order. And I should point out, Mr. Galway didn't detain anybody, as the plaintiff claims. He merely petitioned a magistrate for a TDO, and the magistrate granted it. Did I answer Your Honor's question? You did. Let me just follow up. So in addition to that information, he also, at some point, someone made a request of Ms. Barrett if she would be willing to see a psychologist and or to give up her gun. And she indicated a willingness to do that. Doesn't that suggest that the then decision to detain her, nonetheless, might have been unreasonable, given that she had agreed to remove at least one item that might have been of immediate danger to somebody and also agreed to get some counseling? Well, Mr. Galway testified. He didn't think Ms. Barrett was taking it very seriously. He made that judgment as a professional in interviewing patients. And what Ms. Barrett said is important. She said that she was horse-trading with him. She was trying to give the right answer so he would let her go. So Mr. Galway's instincts were correct, that Ms. Barrett was not being sincere in her statements and that she was trying to say what she thought he wanted to hear, so he would let her go. And that's at page 503 of the joint appendix. Secondly, despite those statements, and the district court dealt with this issue in detail in its opinion on page 785 of the appendix, and I think the court got it right. Mr. Galway consulted with the two doctors and his mental health team to consider whether or not less restrictive measures were available and concluded unanimously that given all the risks, that she owned a firearm, she wouldn't sign herself in for treatment and didn't seem to be taking it very seriously, that that was not an option. There's certainly no PACE law that says if a person makes a statement that they will seek undefined treatment from some undefined doctor at some future point in time, they must immediately be released, regardless of whether or not the mental health examiner believes that's a sincere statement. There's certainly no PACE that says that. And I believe for qualified immunity to not apply, there would need to be a PACE that said that. Did I answer Your Honor's question? Yes, thank you. Thank you. I was going to talk about going, but I see I'm out of time. I'll conclude here and ask the court to affirm the district court. Thank you. Thank you very much, Mr. Trombley. Mr. Elmer. Yes, good morning. Can you hear me? I can. Yes, thank you. May it please the court, my name is Charles Elmer. I counsel for the Defendants and Appellees PAE Government Services, Inc., William Lietzow, Sean Horner, and Shea Wilborn. I'm speaking with the panel today regarding the decision of the district court to dismiss the joint action claims against Mr. Horner and Ms. Wilborn and the conspiracy claim under Section 1983 and Virginia law against officers Mr. Luzier, Hall, Mr. Wilborn, excuse me, Ms. Wilborn, and Mr. Horner. I think our position with respect to the dismissal is pretty straightforward. These are private actors. These are not state actors, and they cannot be liable under Section 1983 for any alleged deprivation of constitutional rights unless there is some other basis to make them liable for the actions of a public official. And here, Ms. Barrett alleges joint action and conspiracy. Those allegations, however, have to meet a certain standard. And in fact, with the change in the pleading standard that the court is now all offering under, the Twombly case was a conspiracy case and made very clear that there have to be enough facts to state a claim to relief that's implausible on its face and moreover, it has to be a plausible suggestion of conspiracy. Here, the Second Amendment complaint does not meet that standard. Despite its great length and the detail of its allegations, there is no factual predicate from which there is any plausible suggestion of a conspiracy between two Arlington County police officers and Mr. Horner and Ms. Wilborn. The first appearance of any kind of allegation of an agreement between these conspirators is in paragraph 91 of the Second Amendment complaint. So, in the grand narrative of her complaint, that's where we first have the meeting between any of the conspirators and the first allegation of any... Yes, sir? Sorry, what paragraph did you say I didn't catch, sir? 91. Okay, thank you. Yes. And that paragraph states, and I can summarize quickly, on or around July 12, at Mr. Horner's request, Officer Hall and Officer Lussier visited PAE's headquarters and met with Mr. Horner and possibly others at PAE and at that meeting, the officers agreed to remove Dr. Barrett from answering the police officer's questions based on her ostensibly being a threat and danger to others. So, that paragraph is the first mention in this pleading of any agreement, any alleged agreement between these conspirators. And as you can see, as the court can see just by looking on the face of the complaint, it is a conclusory assertion of agreement. There is no factual predicate to indicate that an agreement reached. It is the barest outline. And I think it's very important to note that there's no allegation that Mr. Horner knew Officer Lussier or Officer Hall. There's no facts alleged to suggest they had any shared interest. And I think importantly, there's no facts to allege or to suggest why the officers, Officers Lussier and Hall, would have any motive to enter into an agreement with a person they've never allegedly met in order to detain, yes, Your Honor. So, Mr. Cohen, in response to one of my questions, said that the actors don't need to share a motive so long as they have a common plan, in this case, to violate this civil right. Is that a distinction? I mean, is that a valid distinction in this case? I don't believe it is, either as with respect to the pleading standard or with respect to the burden of proof or the burden of alleging a claim of conspiracy. There's a big difference between not sharing a motive or not having the same motive and having no motive at all. And I would, I think there is authority from Mr. Cohen's position that the conspirators don't have to share the same motive. But here, the facts don't suggest any motive. And I think that's important with respect to the broad plausibility analysis that this court, and of course the trial court, has to engage in. And I believe that one of the panel questions early on in this oral argument suggested just that. Why would two police officers from Arlington County have any interest in detaining somebody when there was no basis for doing so? And I think it's important for the pleading that this conclusory assertion is just repeated through the recitation of meetings, discussions, and the like that follow, which ultimately result in the issuance of the emergency custody order. And there's no further facts that are elicited with respect to how that agreement even came into existence in any kind of plausible sense of the word. The fact that there's detail in the complaint is a point that's made in the reply brief of Ms. Barrett, but it doesn't make up for that serious failing. And it doesn't make up for the fact that there's no allegation whatsoever that the police officers knew that Ms. Barrett was not a threat to anyone, that they knew of the PAE conspiracy to prevent her from whistleblowing, that they knew that what was being told them was false. There's no allegations at all. What we have are independent actors acting independently, and we have an overlay of a conclusory assertion of concerted, excuse me, of an agreement, a shared plan, a mutual understanding to detain someone when there's no probable cause. And I think in the grand scheme of public policy in this particular context, I think the standard needs to be meaningful and should be meaningful because you have the public interacting with law enforcement. And if all it takes is that rare, grand, unspecified allegation of a conspiratorial agreement to get over a motion to dismiss and move on with a case and prove it, that would have effects on cooperation with law enforcement. For those reasons, and the reasons set forth in our submissions, we ask that this court affirm the dismissal of the joint action claims and the conspiracy claims in this case. Thank you, Mr. Elmer. Mr. Cohen, you have some rebuttals. Yes, in my brief time, I'd like to make one point about conspiracy and then move on to Mr. Galway, if I may. With respect to conspiracy, again, the nature of, there's two different conspiracies. The nature of the first is that the PAE personnel conspired. Mr. Cohen, sorry. It might be helpful if everybody muted their lines because I'm getting a lot of static on this end just to be sure everybody's muted. Thank you. The second amended complaint pleads allegations of a conspiracy between the PAE personnel amongst themselves to engage in this conduct because of the fraud that Dr. Barrett uncovered a couple of weeks before the events in question. And we would refer the court to those very specific allegations. The joint action slash conspiracy with the police officers is not that. It is that they entered into a conspiracy or joint action to seize her without probable cause. And with respect to that, I would ask the court to take a look at joint appendix page 716 when it gets a chance. This is an email from Mr. Horner to the two officers after they left the first day that they were called in a non-emergency call in which Mr. Horner says to the two police officers, we feel the best course of action with the greatest chance of success is to have APD, the Arlington Police, take the employee statement in our office with the hope that the employee will provide that same concerning statements made previously to our HR personnel allowing APD to take the necessary action to obtain an evaluation and assistance for the employee. We would cite joint appendix 716 as evidence of joint action between PAE and the police. With respect to Mr. Galway, he's distinguishable from Goynes. And the reason why is two main reasons. One is that Mr. Whitson... But how is that evidence of joint action to falsely... to commit her for no reason? That is actually saying she will repeat the concerning statement which indicates that she is a danger to others and then the police would commit her. But the evidence... I mean, that's appropriate. That's not a lack... That's not for no reason at all. But the evidence shows that she did not make the concerning statements during the conference meeting with the two police officers and they seized her anyway. If I may, I'd like to move to Mr. Galway... Because she had made the statements. If she had made them? I said they seized her because they were advised that she had made those statements. Well, they were also advised by Ms. Wilborn and Mr. Horner that she did not pose a threat. That was their testimony at their deposition. With respect to... The counsel indicated with cites of the record that Mr... that Horner and Wilborn did indicate that she was a threat and they were concerned. They made admissions during their testimony. We've documented it in our briefs where they admitted that she did not pose a threat to herself or to others. At best, it was a concern over mental health issues. But as we know, the standard in Bailey and Goins is not just if the police officer or the mental health evaluator believes that the person is in need of mental health assistance. It's got to be more than that. And that is that the person posed a threat to either themselves... an imminent threat either to themselves or to others. With respect to Mr. Galway, he should not get the benefit of Goins. The reason is twofold. One is because he was explicitly told by Mr. Litzow... Mr. Litzow confirmed it during his deposition that he told Mr. Galway that she's not a threat. And contrary to what opposing counsel said, they knew each other very well. And Mr. Litzow was aware of the stalking phenomenon because the evidence in the case is that he and his family experienced it when they were put on a list for ISIS. The other difference with Mr. Galway is that the evidence shows that he misled the magistrate judge because he failed to indicate that she suffered from any mental illness in his petition. And he also confirmed that Dr. Barrett said that she would see a psychologist for mental health assistance and also would voluntarily give up the gun even though the gun was not an issue here. Under the Virginia statute, that was enough not even to seek the petition. So for those reasons, it's not an issue. Thank you very much. All right. Thank you, Mr. Cohen. Thank you, counsel, for your arguments here this, I guess it's afternoon. I want on behalf of the court to extend our thanks. We typically come down from the bench and greet each person with a firm handshake. We cannot do that. All we can do is offer a virtual hello. But know that we really appreciate your arguments and thank you for continuing to help us do the important work of our court. So with that, the case is submitted and the court will stand adjourned. Thank you. Thank you. This court stands adjourned signed and diagnosed by the United States.
judges: Albert Diaz, Stephanie D. Thacker, William B. Traxler Jr.